MELVIN WILLIAMS,

      Plaintiff,

         v.

WEXFORD HEALTH SOURCES, INC.,

      Defendant.

No. 14 C 932

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

Plaintiff Melvin Williams ("Williams"), an inmate at Stateville Correctional Center, sued defendant Wexford Health Sources, Inc. under 42 U.S.C. § 1983 for deliberate indifference in connection with the diagnosis and treatment of Williams's diabetes. Currently before the Court is Wexford's motion for summary judgment. R. 126. For the following reasons, the Court grants in part and denies in part Wexford's motion.

**Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere

scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

This case primarily concerns Williams's claim that Wexford—a private corporation contracted to provide healthcare services for inmates at Stateville—is liable for deliberate indifference based on its failure to appropriately address Williams's extreme weight loss (40 pounds in 14 days) and delay in diagnosing the diabetes that caused that weight loss (Count I). The Court first addresses whether Williams has shown a triable issue as to deliberate indifference on Count I, and then whether Williams has established a basis on which Wexford may be liable. Finally, the Court addresses Williams's deliberate indifference claim based on Wexford's failure to prescribe a special diet to manage his diabetes after his diagnosis (Count II).

## I.    Count I – Extreme Weight Loss And Diabetes Diagnosis

### A.    Deliberate Indifference

In Count I, Williams alleges deliberate indifference based on Wexford's delayed diagnosis of his diabetes. On June 14, 2011, Williams was found unconscious in his prison cell, and tests revealed very high glucose levels. R. 134 ¶¶ 62, 67 (Williams's Response to Wexford's L.R. 56.1 Statement). Williams was

transferred to the hospital, where doctors determined that Williams was diabetic and had suffered a hyperglycemic episode. *Id.* ¶¶ 67, 69. During the weeks preceding the hyperglycemic episode, Williams suffered a 40-pound weight loss that was noted by medical professionals in two visits, but was not properly diagnosed or addressed as stemming from diabetes. *Id.* ¶¶ 60-61, 72. Williams argues that absent Wexford employees' delay in treatment and improper treatment, he would have been diagnosed as a diabetic sooner and would not have suffered the hyperglycemic episode.

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). To survive summary judgment on a deliberate indifference claim, a plaintiff "must satisfy two elements, one objective and one subjective." *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013). "To satisfy the objective element, [the plaintiff] must present evidence supporting the conclusion that he had an objectively serious medical need." *Id.* To satisfy the subjective element, the plaintiff must present evidence supporting the conclusion that "defendants were aware of his serious medical need and were deliberately indifferent to it." *Id.* "To establish deliberate indifference, [a plaintiff] must meet essentially a criminal recklessness standard, that is, ignoring a known risk." *Id.* at 481.

Wexford does not meaningfully contest that Williams has presented evidence satisfying the first, objective showing. And the Court finds that Williams's extreme

3

weight loss and undiagnosed diabetes plainly constitutes an "objectively serious medical need." *See id.* at 480. Wexford notes that Williams "has no verifying medical evidence" in the form of testimony by a doctor or expert "supporting a claim of delayed medical treatment." R. 137 at 13. But the Seventh Circuit has explained that the "verifying medical evidence" required "to establish the detrimental effect of delay in treatment" and therefore "the seriousness of [plaintiff's] medical condition" need not be expert testimony. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). The Seventh Circuit in *Grieveson* found a genuine issue of material fact based on medical records "indicating that [plaintiff] had a nasal fracture . . . and that he may need to see a specialist." *Id.* Similarly here, the Court finds "verifying medical evidence" in the form of medical records showing that Williams needed to be hospitalized for a hyperglycemic episode after two medical visits noting his weight loss but failing to diagnose his diabetes. *See id.* These records are sufficient to establish "the detrimental effect of delay" and thus "the seriousness of [Williams's] condition" as a matter of law. *See id.*

Turning to the second, subjective element, the Court finds that Williams has presented sufficient evidence that Wexford employees "were aware of his serious medical need and were deliberately indifferent to it" to survive summary judgment. *See McGee*, 721 F.3d at 480. The undisputed evidence shows that between July 1, 2010 and May 23, 2011, Williams consistently weighed between 191 and 203 pounds. R. 134 ¶ 72. His weight was recorded at 202 pounds in his medical charts on May 23, 2011. *Id.* But at a medical appointment a mere 14 days later, on June 6,

2011, he weighed 162 pounds. *Id.*; R. 128-1 at 103. Despite clearly documented evidence of his extreme, 40-pound weight loss on June 6, 2011, Williams did not have another medical appointment until June 13, 2011—the day before his hyperglycemic episode—when he met with Dr. Catalina Bautista, Stateville's Medical Director. R. 134 ¶¶ 61, 74. Dr. Bautista recorded that Williams complained of losing 40 pounds since his last visit. *Id.* ¶ 61. But Dr. Bautista took no medical action beyond conducting a liver ultrasound to test for a recurrent or new cancer. *Id.* (Williams had kidney cancer in 2007. *Id.* ¶ 40.) Dr. Bautista did not perform an available test (called "Accu-Check") that could have confirmed Williams's hyperglycemic condition within minutes. R. 128-1 at 35, 38. Dr. Bautista failed to do so despite the fact that Williams had two previous glucose screenings above the normal range. R. 134 ¶¶ 45-47, 78-79. (Specifically, tests showed that Williams's glucose rose from 75 MG/DL on June 9, 2010 to 114 MG/DL on both November 3, 2010 and March 8, 2011—both above the normal range of 65-110 MG/DL. *Id.*) On June 14, 2011, the day after his visit with Dr. Bautista, Williams was found unconscious in his cell, and two Accu-Check tests reported readings of up to 1409 MG/DL. *Id.* ¶¶ 62, 67.

Weight loss of the degree that Williams underwent in a 14-day period is the type of obvious, serious condition that warrants immediate and concerted attention. *See* R. 137 at 10 (Wexford conceding: "No one is disputing that a forty (40) pound weight loss causes a 'red flag'"). When Dr. Arthur Funk, Wexford's Regional Medical Director for Illinois and Wexford's designated corporate witness, was asked "[w]hat

5

can cause such a rapid decline in a person's weight in a two-week period," he responded, "Well, uncontrolled diabetes can." R. 128-1 at 60. Dr. Funk went on to list other conditions, including diarrhea and cancer, that could cause such weight loss, but he confirmed that the medical records made clear that Williams was not suffering from diarrhea and that Williams did not have known, active cancer at the time. *Id.* Dr. Funk went on to testify that any "doctor practicing medicine in the State of Illinois," as well as doctors "[o]utside the State of Illinois," would know "that a rapid weight loss could be an indication of diabetes." *Id.* at 71; *see also* R. 136 ¶ 81 (Wexford's Response to Williams's L.R. 56.1 Statement of Additional Facts).

Yet no one at Wexford performed a simple test to diagnose Williams during the period of the extreme weight loss, including between June 6, 2011 when the weight loss was first documented and Williams's June 14, 2011 hyperglycemic episode. To be sure, Dr. Funk also testified that Dr. Bautista's decision to order only a liver ultrasound test on June 13, 2011 fell within the standard of care, and another Wexford medical director said the same. R. 134 ¶¶ 74, 75, 80. But this is ultimately a determination for a jury to make. The Court finds a genuine issue of material fact as to the subjective element of the deliberate indifference standard. *See, e.g.*, *Dobbin v. Artuz*, 143 F. Supp. 2d 292, 301 (S.D.N.Y. 2001) (explaining that "the failure to provide prescribed medication in the face of an inmate's extreme weight loss and deteriorating condition" could violate the Eighth Amendment) (citing *Kaminsky v. Rosenblum*, 929 F.2d 922, 924 (2d Cir. 1991)); *Anderson v. Kooi*,

2011 WL 1256942, at \*1 (N.D.N.Y. Apr. 1, 2011) (denying "summary judgment to the extent that the amended complaint alleges deliberate indifference based on rapid weight loss" of inmate).

### B.     Wexford Liability

To hold a private corporation like Wexford "liable under § 1983 and *Monell* [*v. Dep't of Social Serv.*, 436 U.S. 658 (1978)]," a plaintiff must make a further showing—"that [an] official policy, widespread custom, or action by an official with policy-making authority was the moving force behind his constitutional injury.'" *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (quoting *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016)).[1] Not only overt policies, but also "implicit policies as well as a gap in expressed policies," may be sufficient. *Id.* To survive summary judgment on a *Monell* claim "against Wexford under [the Seventh Circuit's] current precedent, [the plaintiff] must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical

---

[1]     Williams argues that in addition to *Monell* liability, *respondeat superior* liability can apply to private corporations like Wexford. He cites *Shields v. Ill. Dep't. of Corrs.,* 746 F.3d 782 (7th Cir. 2014), in support of this proposition. Although the Seventh Circuit "questioned in *Shields* whether private corporations might also be subject to *respondeat superior* liability, unlike their public counterparts," the Seventh Circuit did not resolve that issue in *Shields*, and it has since continued to "leave it for another day." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017). Thus, for now, the long-standing rule that "a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights" stands. *Iskander v. Vill. of Forest Park,* 690 F.2d 126, 128 (7th Cir. 1982).   This Court is bound by existing Seventh Circuit precedent. *See Reiser v. Residential Funding Corp.,* 380 F.3d 1027, 1029 (7th Cir. 2004) ("Just as the court of appeals must follow decisions of the Supreme Court whether or not we agree with them, so district judges must follow the decisions of this court whether or not they agree."). The Court thus concludes that Wexford, as a private corporation, cannot be liable pursuant to § 1983 under a *respondeat superior* theory.

7

needs, or a series of bad acts that together raise the inference of such a policy." *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014) (citing *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004)).

The Court finds the evidence considered in the light most favorable to Williams sufficient to survive summary judgment as to *Monell* liability on the part of Wexford. Williams elicited testimony from Certified Medical Technician Wendy Olsen-Foxon, who was on call and encountered Williams laying on a stretcher on June 14, 2011, the day Williams was hospitalized. R. 134 ¶ 7. Olsen-Foxon testified in her deposition, in response to the question of whether she "recall[ed] ever saying to Mr. Williams something to the effect of, an inmate has to be pretty much dying before Wexford would do anything to help":

> I would really prefer not to answer that because . . . I've had too many of patients pass away because of . . . making things cheap, lowering costs, not getting sent out for three, four months when they have cancer, not being diagnosed until they are stage 4. That's why. Lantis being taken away from the diabetics who it's working for. So there.

R. 128-1 at 91; R. 136 ¶ 82. Based on this testimony, a reasonable trier of fact could conclude that Wexford has an implicit policy or custom of delaying in diagnosing or refusing appropriate medical treatment for inmates' serious health conditions— including diabetes—until those conditions are at an advanced stage.

Such an inference is further supported by evidence of Williams's "own experience" with Wexford on multiple separate occasions. *See Daniel*, 833 F.3d at 736. In addition to Wexford's failure to provide a follow up appointment for a week after William's 14-day, 40-pound weight loss was first documented on June 6, 2011

and Dr. Bautista's failure to perform a simple test for diabetes on June 13, 2011, the record reflects a number of other missteps by Wexford in the weeks leading up to the onset of Williams's weight loss. *See, e.g.*, R. 134 ¶ 52 (on April 18, 2011, a Wexford physician's assistant recorded an abnormal tumor marker test result for Williams and recorded that Williams should be referred to the medical director on April 20, 2011 to discuss this result, but there is no evidence that Williams was seen on April 20, 2011); *id.* ¶ 53 (an April 22, 2011 sick call was cancelled because no provider was available); *id.* ¶ 56 (an April 29, 2011 physician's assistant note states that no visit with the medical director to discuss Williams's abnormal tumor marker test result occurred); R. 128-1 at 8 (Williams testified that other medical appointments were cancelled during this time period).

Williams also has presented evidence sufficient to support the conclusion that an "unconstitutional custom, policy or practice" at Wexford was the "moving force" behind his injury. *See Daniel*, 833 F.3d at 736. Namely, the medical record evidence supports that if Williams had been diagnosed and treated with diabetes sooner, he would not have had a hypoglycemic episode that resulted in hospitalization. Considered together, the Court finds that Williams has presented evidence that "raises a genuine issue of fact as to whether his injury resulted from systemic, gross deficiencies in [Wexford's] medical care," as opposed to "isolated problems." *See Daniel*, 833 F.3d at 735-36 (evidence in the form of inmate's "own experience" and "deposition testimony from Jail staff" sufficient to survive summary judgment on

deliberate indifference claim; plaintiff "need not present evidence that these systemic failings affected other specific inmates").

## II.    Count II – Special Diet

The Court does, however, agree with Wexford that Williams has not demonstrated a genuine issue of material fact on his special diet claim in Count II. Williams alleges in Count II that since his diabetes diagnosis in June 2011, Wexford personnel have been deliberately indifferent by failing to prescribe a diet for him that included more foods like fruit and fish to manage his condition. The only evidence Williams offers in support of this claim, however, is his own testimony about prison officials denying him a special diet and offering few healthy items for purchase in the commissary. R. 135 at 8. Williams concedes that he "has not made requests for a special diet since 2012." *Id.*

Assuming, without deciding, that Wexford medical personnel could prescribe a diet that would meet any medical requirements related to Williams's diabetes, there is no indication in the record that Williams's glucose levels are not appropriately managed—*i.e.*, that he has suffered any injury based on the lack of a special diet. Nor is there any indication in the record that the failure of Wexford personnel to prescribe a certain diet is the cause of any uncontrolled symptoms, to the extent they exist. Indeed, Williams concedes that insulin-dependent diabetics at Stateville do receive diet accommodations—namely, they receive a special evening snack that is not provided to other inmates. R. 134 ¶ 38.

"[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible," but only to "reasonable measures to meet a substantial risk of serious harm." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). The Court finds that Williams has not created a question of fact as to whether his dietary requests were medically necessary or whether Wexford personnel were deliberately indifferent to his serious medical needs in failing to prescribe him the diet containing fruit and fish he sought after his diabetes diagnosis. *See, e.g.*, *Williams v. Hartz*, 43 F. App'x 964, 966 (7th Cir. 2002) (affirming grant of summary judgment on claim for deliberate indifference based on diabetic prisoner's request for special diet where there was no evidence that the "refusal to place [him] on a special diet reflected a conscious disregard to his well-being"). The Court therefore grants Wexford's motion for summary judgment as to Count II.

## Conclusion

For the foregoing reasons, the Court denies Wexford's motion for summary judgment [126] as to Count I and grants Wexford's motion as to Count II.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated:  November 9, 2018